## HINDLEY v. HINDLEY.

(Supreme Court, Appellate Division, First Department. May 31, 1912.)

DIVORCE (§ 129*)—ADULTERY—EVIDENCE.

In a prosecution for divorce for adultery, evidence *held* insufficient to sustain a referee's finding for plaintiff.

[Ed. Note.—For other cases, see Divorce, Cent. Dig. §§ 411–441, 454; Dec. Dig. § 129.*]

Appeal from Trial Term, New York County.

Action by Charles T. Hindley against Mary Bagot Hindley for divorce. From a judgment for plaintiff on the decision of a referee, defendant appeals. Reversed.

Argued before McLAUGHLIN, LAUGHLIN, MILLER, and DOWLING, JJ.

William Travers Jerome, of New York City, for appellant.

Moses H. Grossman, of New York City (Frank M. Avery and Mark M. Schlesinger, both of New York City, on the brief), for respondent.

LAUGHLIN, J. It is impossible to reconcile the testimony adduced on the trial of the issues in this action consistently with the honesty of all of the witnesses. The conclusion is irresistible that perjury has been committed; but there is room for grave doubt as to whether the adultery alleged was committed. The learned referee, of course, was in a better position to determine who gave false testimony than we are, for he was in a position to observe the witnesses while they were in the courtroom and on the stand; but the evidence upon which the guilt of the defendant is predicated is not of that satisfactory character required to warrant the dissolution of a marital contract, which affects not only the parties but the public as well.

The parties were married on the 25th day of April, 1905, and after living together until December of the same year they separated, and never again resumed marital relations. On separating from her husband, the defendant became a member of her mother's household, residing in the city of Greater New York during the winter and occupying a cottage with her mother, two sisters, and brother at Seabright, N. J., during the summer months. They kept servants and lived comfortably, and the defendant dressed well, and was not obliged to earn her own living, and her friends and associates appear to have

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

been in like circumstances. The judgment is based on a single act of adultery claimed to have been committed with one Heiser, who was a traveling salesman of intemperate habits and without means, in his hall bedroom in a furnished rooming house at 229 West Sixteenth street, borough of Manhattan, on Saturday night the 24th day of July, 1909. The complaint neither charges her with having committed adultery at that place, at said time, nor with said Heiser at any time or place.

It is alleged upon information and belief, in the first count of the complaint, that she committed adultery with one John P. Wilson at that place on August 28th of the same year, and at 247 West Fiftieth street on the 24th day of June, before, and generally at those two places and divers other places in the city of New York between June 1, 1908, and the date of the commencement of the action, which was November 26, 1909, although the complaint was verified on the 24th of August that year. In the second count of the complaint it is alleged on information and belief that between the 1st day of December, 1905, and the commencement of the action, the defendant at divers times and places in the city of New York and elsewhere committed adultery with men whose names are unknown to the plaintiff. The corespondent, so far as the evidence shows, was at all times known by his name as given upon the trial, and there is no evidence tending to show that any misleading information was given with respect to his name. The first cause of action was abandoned on the trial, and after considerable evidence had been introduced tending to show that the defendant frequently accompanied Heiser to his room during June, July, and August, 1909, it was quite conclusively shown that Heiser was required by his landlady to vacate his room at 229 West Sixteenth street, and he removed his effects, which he was able to do in a dress suit case, on Monday, July 26th, on account of his having had a woman in his room the Saturday night before; and by mutual consent the charge was then limited to that occasion or a date prior thereto, and the issue became merely one of identity, for it was uncontroverted that Heiser did bring a woman to his room who remained with him that night.

Both Heiser and the defendant testified that neither had ever seen the other until they met in the courtroom. No one who knew them both testified to ever having seen them together, and no one who knew the defendant testified to having seen them together, excepting one Brown, who was a bookkeeper in the employ of plaintiff's father, and who had arranged for the employment of a young man, apparently without experience, as a detective, who worked up the case for the plaintiff over a period of more than a year, and he testified that in the month of August, 1909, he was on West Sixteenth street nearly opposite this place, with plaintiff, and saw the defendant and Heiser leave No. 229. He could not identify the corespondent, and it is uncontroverted that Heiser never returned to that room after having been required to leave in the month of July before. The other witnesses who testified for the plaintiff knew Heiser and undertook to identify the defendant by photographs and by seeing her upon the

trial. According to their testimony, she and Heiser were frequently together at a café on Eighth avenue frequented by women of the street, and on Eighth avenue and West Sixteenth street, and at his room. One of them, a witness named Hannon, who was only 19 years of age, testified that on the night in question he returned from one of Childs' restaurants, where he was employed as a waiter, at half past 1 o'clock and retired in his room next to Heiser's, and that soon thereafter he was awakened by a woman crying in Heiser's room, and on going in he found the door open and that they were arguing; that the woman addressed Heiser by his given name, and asked him to give her back her $15 and her hair pins, stating that she wanted to go home; that she was half undressed and sitting in a chair in her underclothes, and they were both intoxicated; that Heiser in her presence told him that she was intoxicated and not to pay any attention to her; that she wanted to go away, but Heiser said, "No, we will stay here," and thereupon took off her stockings and stated that he was ready to go to bed; that he was in the room with her alone while Heiser went to the bathroom and asked her why she was crying and about her complaint with respect to her money.

It is fairly to be inferred from the testimony of both Hannon and Heiser that the woman who was in Heiser's room at that time was neither shocked nor disturbed, in the least, by the presence of Hannon, who was a complete stranger to her, and she did not display any evidence of modesty or manifest the least diffidence in remaining in his presence in her scant attire and holding a conversation with him. At the time in question Heiser was on intimate relations with a woman who was in his own walk in life and evidently was not very particular as to where she went with him, and according to his testimony and to hers, she is the woman who came to his room and remained with him that night. After she had so testified unequivocally before the referee, a prosecution for perjury was instituted before a magistrate against Hannon, who was a friend of Heiser's. She was summoned to the district attorney's office and questioned about her testimony before the referee. It is evident from the attitude of the assistant district attorney, as given by her, that he had been led to believe either that she had testified falsely, or that she would not stand by her testimony; but she insisted that it was true and repeated it before the magistrate. After she had thus been summoned to the district attorney's office, some of Hannon's friends, who were her café friends, interceded with her on his behalf; and on being summoned to the district attorney's office a second time she claimed that her testimony as first given was false, and later on she was recalled before the referee and retracted it.

There is no evidence tending to show that any one attempted to influence her original testimony; but there is ample evidence that there was an attempt to influence her to change it. The conduct of the woman in Heiser's room was what might be expected from a woman who frequented and associated promiscuously with men and women in such cafés and was accustomed to that life; but not what would naturally be expected from a woman of some refinement at least and occupying the defendant's position in life. The defendant, her moth-

er, her two sisters, and her brother testified that she was at the cottage at Seabright every night during that summer, and that she only came to the city on a few occasions during the daytime. According to the uncontroverted testimony, they usually invited friends to spend week-ends with them at Seabright, and while the case was being tried on the theory that the act of adultery was committed in August, the testimony of visitors during that month was also given, showing that the defendant was at home on those occasions. The evidence affords no explanation as to where, when, or how the defendant and the corespondent could have met or become acquainted. It is, of course, possible that they met on the street or elsewhere and dispensed with the formality of an introduction, and that she consented to visit his café and drink to excess and accompanied him to his room, and that she became so infatuated with him that she left her comfortable surroundings and friends at Seabright, and, leading her relatives to think that she had retired, left the house secretly and met the corespondent and by automobile or otherwise came to New York and became intoxicated with him and accompanied him to his room on the night in question and returned before her absence was discovered; but that is so improbable that it should be shown by evidence that carries conviction to the mind, which the evidence in the record before the court on this appeal does not do.

It follows that the judgment should be reversed, and a new trial granted before another referee, with costs to appellant to abide the event. All concur.